FILED

**NOT FOR PUBLICATION**

SEP 27 2013

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

THE HUMANE SOCIETY OF THE UNITED STATES; WILD FISH CONSERVANCY; BETHANIE O'DRISCOLL; ANDREA KOZIL,

        Plaintiffs - Appellants,

    v.

PENNY PRITZKER, Secretary of Commerce; SAMUEL D RAUCH, III, Acting Assistant Administrator for NOAA Fisheries; HELEN GOLDE, Acting Director, Office of Protected Resources, NOAA Fisheries,

        Defendants - Appellees,

    and

STATE OF WASHINGTON, by and through its Department of Fish and Wildlife; STATE OF OREGON, by and through its Department of Fish and Wildlife; STATE OF IDAHO, by and through its Department of Fish and Wildlife,

        Intervenor-Defendants - Appellees.

No. 13-35195

D.C. No. 3:12-cv-00642-SI

MEMORANDUM[*]

---

      [*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted September 20, 2013
San Francisco, California

Before:  FISHER and PAEZ, Circuit Judges, and FOGEL, District Judge.[**]

The plaintiffs appeal the judgment entered in favor of the defendants on their claims under the Marine Mammal Protection Act (MMPA) and National Environmental Policy Act (NEPA).  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

1.      In a previous appeal, we vacated the National Marine Fisheries Services' (NMFS) action and remanded for the agency to "adequately explain[] its finding that sea lions are having a 'significant negative impact' on the decline or recovery of listed salmonid populations given earlier factual findings by NMFS that fisheries that cause similar or greater mortality among these populations are *not* having significant negative impacts." *Humane Soc'y of U.S. v. Locke* (*Humane Society I*), 626 F.3d 1040, 1048 (2010).  NMFS has now included in its new decision memorandum a 13-page explanation for these seemingly disparate factual findings.  This explanation discusses, among other things, the qualitative differences between regulated and managed fisheries and hydropower operations on the one hand and pinniped predation on the other.  The

_____

[**] The Honorable Jeremy D. Fogel, United States District Judge for the Northern District of California, sitting by designation.

2

decision memorandum also discusses the difficulty in estimating actual sea lion predation and the socio-economic and cultural benefits that factored into the agency's fisheries' analyses. In reviewing the new record, we cannot say that the agency has failed to "examine the relevant data" or "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

2. The 2008 authorization limited the number of sea lions that could be killed to the lesser of 85 sea lions per year or "the number required to reduce the observed predation rate to 1 percent of the salmonid run at Bonneville Dam." 73 Fed. Reg. 15,483, 15,486 (Mar. 24, 2008). In *Humane Society I*, we construed this as an implicit finding that "California sea lion predation greater than 1 percent would have a significant negative impact on the decline or recovery of the listed salmonid populations." 626 F.3d at 1052. We held that NMFS had not "adequately explained why a California sea lion predation rate of 1 percent would have a significant negative impact on the decline or recovery of these salmonid populations," *id.* at 1048, and we "echo[ed] the concerns of the Marine Mammal Commission," which had "repeatedly emphasized to NMFS the need to 'identify the level at which predation of salmonids by pinnipeds no longer would be

3

considered significant,' because 'the taking authority should lapse once predation is reduced to a level where it no longer is having a significant impact,'" *id.* at 1052.

In the new authorization, NMFS has limited the number of sea lions that can be killed to 92 animals per year but has altogether eliminated the 1 percent predation rate threshold for suspending sea lion removals, deeming it both unnecessary for the protection of the California sea lion population and impractical in light of the potential for predation rates to fluctuate. Instead, NMFS has relied upon seven qualitative factors, which are discussed below, to justify its determination of "significant negative impact," and it has decided "at the conclusion of the 5-year authorization to assess predation trends to determine whether the lethal removal authorization should continue."

The plaintiffs contend that this action fails to respond to concerns raised in *Humane Society I* and, more broadly, that with the elimination of the 1 percent threshold the agency's authorization would permit the states' to lethally remove sea lions even if sea lion predation dropped well below 1 percent (observed predation was only 1.1 percent in 2011) and, indeed, even if predation ceased entirely. They contend that the agency's approach cannot be reconciled with the plain language of the MMPA, which does not authorize the taking of any sea lion unless pinnipeds "are having a significant negative impact on the decline or recovery of salmonid fishery stocks." 16 U.S.C. § 1389(b)(1). They further contend that NMFS's failure to establish a specific threshold at which sea

4

lion predation will no longer be considered "significant" under the MMPA – at which point authorization to kill sea lions would have to lapse – is indicative of the agency's larger failure to adopt any quantitative or objective, measurable standard for determining when sea lion predation does and does not constitute a significant negative impact on salmonid recovery.

Although the plaintiffs raise valid concerns, we cannot agree that NMFS acted arbitrarily or capriciously by failing to adopt a more quantitative measure of significance. The plaintiffs point out that in 2008 the Marine Mammal Commission recommended that NMFS adopt a quantitative measure of significance and offered three suggested measures. In its 2008 final environmental assessment, however, NMFS considered the Commission's recommendations and provided a reasoned explanation for not adopting them. In its 2012 decision memorandum, moreover, NMFS explained that at the present time the results from modeling "are too preliminary and inconclusive to provide reliable estimates on the absolute impact of pinniped predation." Although the plaintiffs contend that more objective measures of significance are available and workable, we cannot say that the agency's conclusions to the contrary are arbitrary or capricious.

We reach the same conclusion with respect to the agency's determination to rely on a reassessment of the situation at the end of five years to determine whether lethal removal authorization should continue. Although the current authorization does not

5

include any mechanism by which the states will be required to suspend removals if sea lion predation continues to diminish during the five-year life of the authorization, we were informed by counsel during oral argument that the states would exercise discretion to suspend removals if predation fell to acceptable levels, taking the totality of circumstances into account. Given NMFS's determination that there is no quantitative measure of significance that could serve as a bright-line threshold for suspending removals, we cannot say that the path adopted by NMFS is arbitrary or capricious.

3.      The plaintiffs challenge NMFS's interpretation of the statutory term "significant negative impact" as well as the seven factors NMFS used to determine that pinnipeds were having a significant negative impact on the recovery of at-risk salmonid populations at Bonneville Dam.

NMFS's interpretation of "significant negative impact" as an impact that is "meaningful" and "not insignificant," 76 Fed. Reg. 56,167, 56,170 (Sept. 12, 2011), is consistent with the common and ordinary meaning of the word significant. *See* American Heritage Dictionary of the English Language 1630 (5th ed. 2011) ("Having or likely to have a major effect . . . ."); Webster's Third New International Dictionary 2116 (2002) ("having or likely to have influence or effect : deserving to be considered : important, weighty, notable . . . ."). The agency's interpretation, therefore, is permissible under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43

6

(1984).  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

As noted earlier, NMFS has relied upon seven factors to determine that pinnipeds are having a significant negative impact on at-risk salmonid populations at Bonneville Dam: (1) the predation is measurable, has grown since 2002, and could continue to increase if not addressed; (2) nonlethal deterrence efforts have been unsuccessful at reducing the number of sea lions or amount of predation; (3) the level of adult salmonid mortality is sufficiently large to have a measurable effect on the numbers of listed adult salmonids contributing to the productivity of the affected populations; (4) in 2010, California sea lions reached their highest numbers since 2004, thereby demonstrating that their numbers are as yet unpredictable and can easily grow; (5) the predation rate from California sea lions increases when salmonid run sizes decrease; (6) California sea lion and Steller sea lion predation on at-risk salmonids at Bonneville Dam has a combined effect; and (7) the mortality rate for listed salmonids is comparable to mortality rates from other sources that have resulted in the agency using its authority under the Endangered Species Act (ESA) to reduce the impact.  In the absence of a reliable basis for adopting a quantitative standard, we cannot fault the agency for adopting a qualitative standard.  *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 905-07 (9th Cir. 2012); *Ranchers*

7

*Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1096-97 (9th Cir. 2005).

We agree with the plaintiffs that at least in theory, some of these factors – e.g., that "predation is *measurable*" or that the "level of adult salmonid mortality is sufficiently large to have a *measurable* effect on the numbers of listed adult salmonids *contributing* to the productivity of the affected" populations (emphases added) – could be applied in ways that would eviscerate the MMPA statutory standard, confer virtually limitless discretion on the agency to make a finding of significant impact and preclude effective judicial review. However, we do not understand the factors considered as a whole to permit such an application. The seventh factor in particular looks to whether the mortality rate caused by sea lions is comparable to mortality rates from other sources – i.e., dams and fisheries – that have resulted in the agency using its ESA authority to reduce the impact. This factor places a meaningful constraint on the agency's discretion to find sea lion predation to have a significant negative impact. We doubt, for example, that NMFS could reasonably conclude that sustained predation below 1 percent could constitute a significant negative impact under the MMPA standard and these seven factors, at least absent evidence of a disproportionately adverse impact on a particular at-risk salmonid population. Thus, on the existing record, we hold that neither the agency's reliance on these seven factors nor its application of them was arbitrary or capricious.

8

4.     An agency is required to undertake a supplemental NEPA analysis when it makes "substantial changes in the proposed action that are relevant to environmental concerns" or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  NMFS prepared a Supplemental Information Report and concluded that preparing a supplemental environmental assessment was unnecessary.  Because those findings are neither arbitrary nor capricious, we hold that the agency's actions did not violate NEPA.

**AFFIRMED.**