# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 12, 2014          Decided April 17, 2015

No. 13-5057

RICHARD E. LUBOW, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF STATE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00510)

*Elliot H. Scherker* argued the cause for appellants. With him on the briefs were *Brigid F. Cech Samole*, *Rachel A. Canfield*, and *Joe R. Reeder*.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Mercedeh Momeni*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Concurring opinion filed by *Senior Circuit Judge* SENTELLE.

SRINIVASAN, *Circuit Judge*: A statute limits the amount of "premium pay," including overtime pay, federal government employees may earn each year. A group of State Department employees challenges the Department's decision requiring them to repay excess overtime pay they received for work on assignment in Iraq in 2004. We conclude that the Department permissibly construed the statute capping premium pay when determining that the employees' overtime pay exceeded the statutory limit. We also find that the Department did not act arbitrarily in denying the employees a discretionary waiver of their obligation to repay the excess compensation.

I.

At the time of the events in this case, the five plaintiffs—Frank Benevento, David Bennett, Joseph Bopp, James Landis, and Richard Lubow—worked in the State Department as Diplomatic Security Special Agents. In late 2003 or early 2004, each of them responded to a call for volunteers to serve one-year assignments in Iraq under the Coalition Provisional Authority. They arrived in Iraq in February 2004.

Initially, the plaintiffs were assigned to Iraq on temporary duty status; their permanent duty station was in Washington, D.C. Consequently, the plaintiffs received "locality pay"—pay in addition to base salary intended to equalize federal employees' compensation with that of non-federal workers in the same geographic area—as if they were working in Washington, D.C. *See* 5 U.S.C. §§ 5301, 5304. In June or July of 2004, the plaintiffs' permanent duty station changed from Washington, D.C., to the United States Embassy in

Baghdad. Because the plaintiffs were now stationed in a foreign location, they no longer received locality pay. *See* 5 C.F.R. § 531.603.

While in Iraq, the plaintiffs worked, and received compensation for, a significant number of overtime hours. In early 2005, the plaintiffs completed their assignments in Iraq and returned to the United States.

## A.

Federal law limits the amount of "premium pay" a federal employee may receive. *See* 5 U.S.C. § 5547. Premium pay (as opposed to "basic pay") includes types of remuneration such as overtime pay, holiday pay, Sunday pay, night pay differential, and availability pay. *See id.* § 5547(a). As a general matter, the statutory cap applies to each pay period (*i.e.*, biweekly). The cap operates as a limit on the combination of an employee's basic and premium pay in a two-week period. *See id.*

When an employee performs "work in connection with an emergency," however, the biweekly cap in § 5547(a) does not apply. *Id.* § 5547(b)(1). Instead, the statute calls for calculating the cap on an annual basis. *See id.* § 5547(b)(2). The State Department determined that the military operations in Iraq and the aftermath qualified as an emergency. As a result, the plaintiffs were subject to the annual cap, which provides:

> [N]o employee referred to in [§ 5547(b)(1)] may be paid premium pay . . . if, or to the extent that, the aggregate of the basic pay and premium pay . . . for such employee would, in any calendar year, exceed the greater of—

> (A) the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year (including any applicable locality-based comparability payment . . . ); or
>
> (B) the rate payable for level V of the Executive Schedule in effect at the end of such calendar year.

*Id.* § 5547(b)(2).

The statute therefore caps compensation for work in connection with an emergency based on the annual maximum basic pay rate for GS-15 or the annual pay rate for Executive Schedule level V, whichever is greater. At the end of 2004, the annual maximum GS-15 pay rate for employees receiving no locality pay was $113,674. For employees assigned to work in Washington, D.C., the annual maximum GS-15 pay rate, including the applicable locality-pay adjustment, was $130,305. At that time, the annual Executive Schedule level V rate was $128,200.

With regard to the plaintiffs in this case, if § 5547(b)(2)'s cap were calculated as if the plaintiffs received locality pay for Washington, D.C.—as they did when assigned to D.C. for the first half of 2004—the applicable cap would be $130,305. But if the cap were calculated as if the plaintiffs received no locality-pay adjustment—as was the case for the second half of 2004 after their permanent assignment shifted to the U.S. Embassy in Baghdad—the applicable cap would be $128,200.

B.

In September 2004, the Office of Personnel Management issued final regulations implementing § 5547. *See* Premium Pay Limitations, 69 Fed. Reg. 55,941 (Sept. 17, 2004). In

pertinent part, the regulation implementing § 5547(b)(2) largely tracks the statute's language:

> In any calendar year during which an employee has been determined to be performing emergency or mission-critical work . . . , the employee may receive premium pay under this subpart . . . only to the extent that the payment does not cause the total of his or her basic pay and premium pay for the calendar year to exceed the greater of—
>
> (1) The maximum annual rate of basic pay payable for GS-15 (including any applicable locality-based comparability payment . . . ) in effect on the last day of the calendar year; or
>
> (2) The annual rate payable for level V of the Executive Schedule in effect on the last day of the calendar year.

5 C.F.R. § 550.106(c).

OPM also published a statement in the Federal Register elaborating on the operation of the annual cap. *See* Premium Pay Limitations, 69 Fed. Reg. at 55,941. The statement responded to an agency's question about the application of the cap in the circumstances of this case: when an employee is stationed in multiple locality-pay areas during the course of a year. OPM explained that the statute "expressly provides that the annual premium pay cap must be applied to an entire calendar year and that it is based on the applicable rates in effect at the end of the calendar year." *Id.* As a result, "[a] geographic move to an area with different pay rates can raise or lower an employee's aggregate basic pay and the end-of-year

annual cap on premium pay. In turn, a change in aggregate basic pay or the end-of-year cap can change retroactively the date on which an employee reached the annual premium pay cap." *Id.* In that situation, OPM recognized, "an agency may have to recompute retroactively the amount of premium pay owed for one or more pay periods." *Id.*

## C.

On November 24, 2004, shortly after OPM's new regulations took effect, the five plaintiffs received email messages from the State Department notifying them that the Department was "conducting a review of premium pay earnings involving employees supporting the effort in Iraq." J.A. 179. "Because you are assigned overseas," the message explained, "the rate of the annual premium pay cap that applies to you is $128,200 (the rate for Level V of the Executive Schedule)." *Id.* The message told each plaintiff that his earnings to date "have already or will shortly put you above the cap for the current pay year," and that the Department would be "obligated to seek collection of [any] overpayments." *Id.*

As the email message forewarned, each plaintiff received a letter from the Department in April 2005 requiring repayment of premium pay received in excess of § 5547(b)(2)'s cap. The amount owed by each plaintiff was: $7,765.83 (Benevento), $6,308.07 (Bennett), $5,702.69 (Bopp), $435.94 (Landis), and $10,514.98 (Lubow).

The Department gave the plaintiffs the option to dispute their debts through either internal or external administrative review. Benevento chose internal review, and his case was examined by Deputy Assistant Secretary for Global Financial Services James Millette. DAS Millette, relying on the text of the statute and OPM's regulations, determined that Benevento's aggregate basic and premium pay was subject to

the $128,200 cap because, at the end of calendar year 2004, Benevento was assigned to a site with no locality-pay adjustment. The other plaintiffs opted for an outside hearing before an administrative law judge of the General Services Administration Board of Contract Appeals. That judge similarly determined that the Department properly applied § 5547(b)(2) to the plaintiffs' situation.

Each plaintiff also requested that the Department forgive the entirety of his debt pursuant to 5 U.S.C. § 5584. That provision allows an employing agency to waive any claim against an employee "arising out of an erroneous payment of pay" if collection "would be against equity and good conscience and not in the best interests of the United States." 5 U.S.C. § 5584(a). The plaintiffs argued that equitable considerations supported waiver because they had volunteered for a dangerous overseas assignment in a war zone, because there was confusion about how the annual cap would apply, and because the nature of their security assignments required significant overtime hours. DAS Millette denied the waiver requests for all five plaintiffs, reasoning that the plaintiffs bore partial responsibility for the overpayments because they possessed records that would have alerted them that they had received or might receive (and thus would need to repay) compensation in excess of the cap. *See id.* § 5584(b)(1) (an agency official may not exercise his discretion to waive a claim against an employee "if, in his opinion, there exists, in connection with the claim, an indication of fraud, misrepresentation, fault, or lack of good faith on the part of the employee").

The plaintiffs filed grievances with the State Department's Foreign Service Grievance Board. The FSGB agreed with DAS Millette and the Board of Contract Appeals that the $128,200 cap applied to govern the whole year. But the

FSGB determined that DAS Millette erred in holding the plaintiffs partially responsible for the overpayments, agreeing with the plaintiffs that it was unlikely that an employee could have anticipated how the annual cap would apply. "Nor is it clear," the FSGB's opinion continued, "what [the plaintiffs] could have done to avoid overpayments once [they were] notified on November 24 that [they were] nearing the pay cap." J.A. 839. The FSGB sent the plaintiffs' waiver requests back to DAS Millette for a determination of whether collection of the overpayments "would be against equity and good conscience and not in the best interests of the United States." 5 U.S.C. § 5584(a).

DAS Millette invited the plaintiffs to submit additional information. He asked them to address in particular the factors that agency officials are instructed to consider under § 5584's corresponding regulation:

> (A) Whether collection of the claim would cause serious financial hardship to the employee from whom collection is sought.

> (B) Whether, because of the erroneous payment, the employee either has relinquished a valuable right or changed positions for the worse, regardless of the employee's financial circumstances.

> (C) The time elapsed between the erroneous payment and discovery of the error and notification of the employee;

> (D) Whether failure to make restitution would result in unfair gain to the employee;

    (E) Whether recovery of the claim would be unconscionable under the circumstances.

22 C.F.R. § 34.18(b)(1)(iv). In response, the plaintiffs' representative submitted a single letter for all five employees stating that they wished to "rely upon the record already developed in this matter." J.A. 885.

DAS Millette again denied the waiver requests. He emphasized the plaintiffs' refusal specifically to address any of the 22 C.F.R. § 34.18(b)(1)(iv) factors, including their failure to put forth a showing of financial hardship. He grounded his decision in the fourth factor: whether waiver of the debts would result in "an unfair gain" to the plaintiffs. He explained that it would: "I have had to make this determination for over thirty other employees in the exact same situation and they have paid their debts in full." J.A. 847.

The plaintiffs appealed to the FSGB again, and this time, it upheld the waiver denials. The FSGB stressed the plaintiffs' failure to address any of the 22 C.F.R. § 34.18(b)(1)(iv) factors except the fifth (whether "recovery of the claim would be unconscionable under the circumstances"). And the FSGB found "no basis" to overturn DAS Millette's judgment that granting a waiver to the plaintiffs "would create an unfair gain for them vis-a-vis all those similarly situated employees who repaid their excess premium pay for 2004." J.A. 900. The FSGB further noted that DAS Millette's decision was "in line" with precedent "discourag[ing] the approval of waivers when the employee had reasonably prompt notice that the payments were or may have been erroneous, even if the employee was not 'at fault.' " *Id.*

10

D.

The plaintiffs sought judicial review in federal district court. The district court initially remanded the case to the Department based on an "intervening event." *Lubow v. U.S. Dep't of State* (*Lubow I*), 730 F. Supp. 2d. 73, 76 (D.D.C. 2010). The court noted that, in 2005, Congress enacted the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005 (Emergency Supplemental Appropriations Act), Pub. L. No. 109-13, 119 Stat. 231 (2005). The Act allowed heads of executive agencies to "waive" 5 U.S.C. § 5547(b)(2)'s limit on the aggregate of basic and premium pay up to $200,000 during 2005. Emergency Supplemental Appropriations Act § 1008, 119 Stat. at 243. The State Department had taken advantage of that authorization in August 2005 by waiving § 5547(b)(2)'s limit on compensation "payable in calendar year 2005" for employees in Iraq and Afghanistan. J.A. 281. The district court observed that the Department's waiver applied to compensation earned in the last pay period of December 2004—because that compensation would have been "payable" in January 2005—and the court questioned why none of the administrative decisions had explained the effect of the 2005 waiver on the amount of the plaintiffs' debts. On remand, the Department found that the 2005 waiver had no effect on the amount of the plaintiffs' 2004 debts because any pay received by the plaintiffs in 2005 had been excluded from the Department's overpayment calculations for 2004.

The district court then granted summary judgment to the defendants. *Lubow v. U.S. Dep't of State* (*Lubow II*), 923 F. Supp. 2d 28, 30 (D.D.C. 2013). First, the court addressed whether the Department properly determined that the $128,200 cap governed the whole year. Because the issue turned on the validity of OPM's interpretation of 5 U.S.C. § 5547(b)(2), the

court applied the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The court resolved the case at step one, concluding that OPM's interpretation was required by "the statute's plain language." *Lubow II*, 923 F. Supp. 2d at 35. "Because plaintiffs were assigned overseas at the end of 2004," the court reasoned, "plaintiffs' locality-adjusted GS–15 rate *in effect* at that time was $113,674," making the Executive Schedule V rate the higher amount. *Id.* at 36 (emphasis added). The court also upheld the Department's determination that its August 2005 waiver pursuant to the Emergency Supplemental Appropriations Act had no effect on the plaintiffs' debts, and further ruled that the FSGB had not acted arbitrarily in upholding DAS Millette's decision to deny the plaintiffs' requests for discretionary waivers under 5 U.S.C. § 5584.

## II.

The plaintiffs seek review of four final agency actions under the Administrative Procedure Act: (i) the FSGB's determination that the Department properly applied 5 U.S.C. § 5547(b)(2)'s cap on premium pay; (ii) the Board of Contract Appeals' decision to the same effect; (iii) the Department's decision that the August 2005 waiver had no bearing on the plaintiffs' repayment obligations; and (iv) the FSGB's decision upholding the denial of discretionary waivers under 5 U.S.C. § 5584. *See* 22 U.S.C. § 4140(a); 5 U.S.C. § 704. The APA "requires us to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)). We evaluate the district court's grant of summary judgment de novo, *id.*, and we affirm.

A.

We first address the plaintiffs' challenge to the FSGB's and Board of Contract Appeals' decisions that their compensation for overtime work performed in Iraq exceeded 5 U.S.C. § 5547(b)(2)'s cap on annual premium pay. Subsection 5547(b)(2) instructs agencies to set their employees' annual cap at the higher of two figures: (i) "the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year," including "any applicable locality-based comparability payment"; and (ii) "the rate payable for level V of the Executive Schedule in effect at the end of such calendar year." OPM interprets § 5547(b)(2)(A)'s direction to use the GS-15 rate "in effect at the end of such calendar year" to require the use of the GS-15 rate applicable to the *specific employee* in question. In other words, OPM construes "in effect" to reference the circumstances applicable to that employee as of December 31—including, as relevant here, the location of the employee's designated duty station on that date. *See* 69 Fed. Reg. at 55,941.

The plaintiffs dispute OPM's understanding of the statute. They maintain that the statutory references to the GS-15 and Executive Schedule rates "in effect at the end of such calendar year" intend only to reference the rates *generally in force* at the end of the year. Under that view, the statutory phrase aims merely to address a situation in which those rates change during the course of the year. For instance, if Congress had raised the base GS rates by 2% and made that increase effective on September 1, 2004, § 5547(b)(2)(A) would tell the agency to use the post-September GS-15 rate in calculating the annual cap. Similarly, if Congress increased the amount of locality pay for the location "applicable" to the plaintiff's duty station and made that change effective mid-year, the statute would

instruct the agency to use the higher amount. Under that reading, "in effect" would mean only the rate that is legally "in effect." And the statute would remain silent concerning the specific question at issue here: which GS-15 rate to use for a particular employee whose assigned location changes during the year.

The district court assumed, in accordance with the parties' presentations, that *Chevron*'s two-step framework governed the court's review of OPM's interpretation of § 5547(b)(2). *Lubow II*, 923 F. Supp. 2d at 35. Both parties maintain that position on appeal. We accordingly adhere to the parties' framing and examine OPM's interpretation of the statute under *Chevron*. *Cf. Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1054 n.8 (9th Cir. 2010) (assuming, without deciding, the applicability of *Chevron* based on the parties' agreement that *Chevron* governed their dispute). Because the plaintiffs affirm the applicability of the *Chevron* framework, we need not consider potential arguments they might have made (but did not make) against our deferring to the agency under *Chevron*—including the argument contemplated by our concurring colleague to the effect that OPM failed to recognize its discretion under the statute when issuing its guidance. *See Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006). The applicability of the *Chevron* framework does not go to our court's jurisdiction, and a party therefore can forfeit an argument against deference by failing to raise it. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 756 (D.C. Cir. 2009) (per curiam).

Under the *Chevron* framework, if "Congress has directly spoken to the precise question at issue," then "the court, as well the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43. But "if the statute

is silent or ambiguous with respect to the specific issue," we examine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Here, the district court resolved the issue in favor of OPM's interpretation at the first step. The court reasoned that § 5547(b)(2) establishes a rule that the "the rates at the end of the year determine the cap," which, in the court's view, unambiguously "dictates the outcome in exactly the situation where the applicable rate changes during the course of the year, regardless of the reason for that change." *Lubow II*, 923 F. Supp. 2d at 36.

We find it unnecessary to decide the question of § 5547(b)(2)'s ambiguity at *Chevron* step one: because the plaintiffs make no argument that the statute unambiguously compels their interpretation, we need not resolve the step-one question one way or the other. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995). Even assuming that the plaintiffs could make out a case for the statute's ambiguity or silence at step one, we find that OPM's reading of the text is reasonable and deserving of our deference at *Chevron* step two.

As explained, OPM reads § 5547(b)(2)(A) to mean that the employing agency must apply the GS-15 rate "in effect" with respect to the specific employee in question as of December 31, taking into account the employee's locality pay as of that date. The phrase "in effect" surely is amenable to that reading. Indeed, the district court thought it impossible to read the language any other way, because "the text provides no basis for separating rates that are in effect at the end of the year for a certain reason (e.g., a statutory increase in the GS-15 rate) from rates that are in effect at the end of the year for a different reason (e.g., a change in location and hence to the

locality-based comparability payment)." *Lubow II*, 923 F. Supp. 2d at 36.

Moreover, it is eminently sensible for OPM to apply § 5547(b)(2)(A) such that an agency would need to take account of an employee's location only at a single, identifiable point during the year for purposes of determining the "applicable" locality-based adjustment. As the district court noted, selecting some particular date for assigning the amount to plug into the premium-pay cap calculation might seem unfairly to disadvantage certain employees (who, like the plaintiffs, might become subject to a lower cap than would otherwise apply) while working to the advantage of other employees (who might gain the advantage of a higher cap). For instance, an employee transferred at the end of the calendar year to a site with a higher locality-based adjustment would gain a benefit even though she earned less locality pay for most of the year (and vice versa for an employee relocated to a site with a lower locality-based adjustment). But "[v]irtually *every* legal (or other) rule has imperfect applications in particular circumstances." *Barnhart v. Thomas*, 540 U.S. 20, 29 (2003). And here, any such imperfection is substantially offset by the significant gains in efficiency attending the agency's having to take account of an employee's duty station only as of a single date.

The plaintiffs object to what they see as the statute's "retroactive" operation under OPM's interpretation. They argue that it is unreasonable—even absurd—to imagine that Congress wrote a statute under which it could turn out that, at the end of the year, certain employees become subject to a different cap on premium pay than they had anticipated. But the statute would be "retroactive" even under the plaintiffs' reading of § 5547(b)(2)(A): an agency could not definitively calculate its employees' annual cap until the end of the year

because the agency would not necessarily know *ex ante* whether the statutory rates might change. Moreover, as OPM pointed out when responding to concerns about the burdens associated with recalculating the cap for an employee who switches locations mid-year, its regulations allow agencies to defer payment of premium pay until the end of the year. *See* 5 C.F.R. § 550.106(e). If agencies took advantage of that authorization, there would be no need to recoup excess premium pay from employees after-the-fact. *See* 69 Fed. Reg. at 55,941.

The merits of OPM's interpretation become all the more apparent when compared with the uncertainty of the alternative approach offered by the plaintiffs. Because the plaintiffs believe that § 5547(b)(2) does not speak directly to the circumstances of this case, they propose that the agency elect to implement different premium-pay caps to govern different parts of the year. They would apply the statute "as requiring that the period that Plaintiffs spent on [temporary duty assignment] in Iraq from February 2004 to June 2004 be assessed under a cap of $130,305 and that the period from when they were assigned to the Embassy in June 2004 to the end of the year be assessed under the $128,200 cap." Appellants' Br. 37 (brackets in original and ellipses omitted). But there is no clear understanding of how that prorating scheme would work in practice.

For instance, during oral argument, the plaintiffs suggested that, as long as an employee does not exceed the applicable cap during the time period that the cap applies—*i.e.*, resetting the aggregate of the employee's basic and premium pay to zero each time the employee becomes subject to a new cap—the employee could keep everything he had earned. Oral Argument at 14:37–15:30, 52:53–56:10. But that approach is of questionable soundness. It would allow an

employee in the plaintiffs' situation to earn up to $258,505—nearly double the otherwise-applicable annual cap—merely by virtue of having undergone a mid-year transfer. To the extent the plaintiffs argue that the solution would entail applying a prorated cap on a monthly or biweekly basis during the relevant parts of the year (a position they also seemingly advanced during argument, Oral Argument at 14:26–14:37, 17:21–18:06), such an approach would stand at odds with Congress's decision not to apply § 5547(a)—the subsection utilizing biweekly caps—during emergencies. The evident difficulty in understanding the mechanics of the plaintiffs' preferred interpretation contrasts with OPM's straightforward alternative.

Because OPM's resolution of the disputed question "is based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843, we defer to OPM's interpretation of § 5547(b)(2). Consequently, we find that it was not arbitrary or capricious for the Department to apply OPM's guidance in determining the cap that applied to the plaintiffs' premium pay in 2004.

## B.

The plaintiffs argue in the alternative that the Department acted arbitrarily and capriciously in concluding that the August 2005 waiver had no bearing on the amount of overpayments they received in 2004. The plaintiffs are incorrect.

In May 2005, Congress, in the Emergency Supplemental Appropriations Act, gave executive agencies the authority to "waive" § 5547(b)(2)'s limit on the aggregate of basic and premium pay so that certain employees could earn up to $200,000 without hitting the cap. The State Department exercised that authority in August 2005. But the Department's waiver applied only to compensation "payable in

calendar year 2005." That allowance technically extended to pay for work performed during the last two weeks of December 2004 because the corresponding pay date for that period was "in calendar year 2005," *i.e.*, on January 6, 2005. But the Department nonetheless determined that the waiver had no effect on the amount of the plaintiffs' 2004 debt because the earnings the plaintiffs received on January 6, 2005, were excluded from the Department's 2004 overpayment calculations.

The plaintiffs do not dispute that compensation paid on January 6, 2005, was excluded from their respective repayment obligations. They nonetheless argue that the "higher pay cap was indisputably 'in effect' on the last day of the calendar year, . . . a fact that should be dispositive, even under the Department's construction of Section 5547." Appellants' Br. 40. But that argument is a non sequitur. The plaintiffs apparently seek to invoke the language from § 5547(b)(2), but that provision refers only to "the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year" and "the rate payable for level V of the Executive Schedule in effect at the end of such calendar year." 5 U.S.C. § 5547(b)(2)(A), (B). Neither the Emergency Supplemental Appropriations Act nor the Department's August 2005 waiver affected the statutory GS-15 rate or the Executive Schedule V rate. The Department's waiver therefore had nothing to do with § 5547(b)(2)'s operation. In fact, the waiver effectively *supplanted* § 5547(b)(2)'s limit with respect to pay received during calendar year 2005. And because the plaintiffs challenge only the Department's attempt to recoup overpayments they received in 2004, the Department correctly found the 2005 waiver to be irrelevant.

## C.

The plaintiffs' final challenge concerns the Department's denial of their requests for discretionary waivers pursuant to 5 U.S.C. § 5584. That provision enables an agency to waive collection of an erroneous payment made to an employee when collection "would be against equity and good conscience and not in the best interests of the United States." 5 U.S.C. § 5584(a). DAS Millette first ruled that the plaintiffs were statutorily barred from seeking a waiver because they bore partial responsibility for the overpayments. After the FSGB reversed that finding on appeal, DAS Millette determined that the factors listed in 22 C.F.R. § 34.18(b)(1)(iv) nonetheless favored denial. The FSGB upheld that decision.

We are mindful that the plaintiffs volunteered for what was presumably a considerably difficult and dangerous assignment to assist the United States' operations in Iraq in 2004. And as the FSGB itself acknowledged, "it seems unfair" for the government to require the plaintiffs "to refund payments for overtime work they actually performed, when they had no real option but to perform such work, and when those in similar positions in 2005 and subsequent years were paid" in full for their overtime work. J.A. 898. But under the APA's standard of review, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, we ask whether the agency's decision "was based on a consideration of the relevant factors" and whether "there has been a clear error of judgment." *Id.* We conclude that the FSGB adequately grounded its decision in the relevant factors.

First, the plaintiffs' failure to submit evidence addressing any but the last of the 22 C.F.R. § 34.18(b)(1)(iv) factors

weighs substantially against our disturbing the agency's exercise of its discretion. Despite DAS Millette's explicit request for additional information, the plaintiffs chose not to supplement the record with evidence about whether "collection of the claim would cause serious financial hardship," or whether, "because of the erroneous payment, the employee either has relinquished a valuable right or changed positions for the worse." 22 C.F.R. § 34.18(b)(1)(iv)(A), (B). We agree with the district court that, "[g]iven the dearth of information, the [FSGB] had no choice but to conclude that [the] financial hardship and detrimental reliance factors weighed against waiver." *Lubow II*, 923 F. Supp. 2d at 42.

In the context of the record before it, the FSGB's primary rationale—that DAS Millette had already denied waivers to other employees in "the exact same situation"—suffices to justify its decision. The plaintiffs argue that DAS Millette's and the FSGB's consideration of other employees was itself arbitrary. To the contrary, the regulation instructs the deciding agency official to consider whether "failure to make restitution would result in unfair gain to the employee." 22 C.F.R. § 34.18(b)(1)(iv)(D). That factor is not aimed to address circumstances in which the employee obtained an overpayment through bad faith, deliberate omission, or some other underhanded tactic. In those situations, the statute *bars* the employee from obtaining a waiver, and the agency official would not reach the stage where 22 C.F.R. § 34.18(b)(1)(iv)'s factors come into play. *See* 5 U.S.C. § 5584(b)(1); 22 C.F.R. § 34.18(b)(1)(i). Thus, in the absence of a contrary explanation (which the plaintiffs do not provide), the "unfair gain" factor seems to address precisely the assessment made by DAS Millette and the FSGB: whether it would be inequitable to give one employee a waiver when similarly situated employees received no waiver. Because the FSGB based its decision on a factor the regulation apparently requires it to

consider—and because the plaintiffs do not challenge the factors themselves—we cannot say that the Department's determination lacked "reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

The plaintiffs also object to the FSGB's consideration of the notice they received in November 2004 advising them that they had already received, or might soon receive, pay exceeding the statutory cap. The FSGB's decision, however, stated only that DAS Millette's decision was "in line with Comptroller General Decisions which have discouraged the approval of waivers when the employee had reasonably prompt notice that payments were or may have been erroneous, *even if the employee was not 'at fault.'* " J.A. 900 (emphasis added). And the FSGB further explained that, "[w]*hile our earlier decision found that* [the plaintiffs] *were not at fault in accepting or failing to prevent excess premium payments in 2004*, we note that [the plaintiffs] were put on notice in November of the year that the overpayment took place that they were approaching or had already exceeded the pay cap." *Id.* (emphasis added).

To the extent the plaintiffs mean to argue that the FSGB arbitrarily reversed its earlier determination that the plaintiffs were not to blame for the overpayments, the italicized language refutes that characterization of the FSGB's reasoning. To the extent the plaintiffs instead dispute the FSGB's premise—that the Department's November 2004 email constituted "reasonably prompt notice" of the possibility of overpayments—we fail to see how that would meaningfully support their case for a waiver. The plaintiffs offered no evidence of detrimental reliance on any belief that they would be able to keep their overtime pay. And the plaintiffs have consistently argued that they had no choice about working significant overtime hours due to the nature of their security

positions and the realities of the United States' mission in Iraq in 2004. It therefore would seem that the issue of notice is largely irrelevant to an assessment of the equities of their case. Thus, even if the FSGB mistakenly assumed that the November 2004 email messages gave adequate notice that the plaintiffs were in danger of exceeding the cap—a determination we do not reach—a contrary finding would do little to advance the plaintiffs' case for a waiver.

\* \* \* \* \*

We affirm the district court's grant of summary judgment to the defendants.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, concurring: I fully concur with the court's judgment and much of the explanation and reasoning leading to the same. However, one critical step of the analysis gives me pause. The court applies the reasoning of *Chevron* step two, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), to the Office of Personnel Management ("OPM") interpretation of 5 U.S.C. § 5547(b)(2), based on the parties' apparent assumption that there was ambiguity in the statute to be resolved by the OPM. *See* Maj. Op. at 13-14. That resolution by OPM would thus be subjected to the deferential standard of *Chevron* step two and upheld if reasonable. The court reviewed the OPM interpretation, found it reasonable, and upheld it. *Id.* at 14. While I do not disagree with the conclusion, I am not sure that the approach is fully compliant with our precedent.

As we have previously stated: "[W]e recently affirmed a line of circuit decisions which hold that 'deference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress.'" *Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D. C. Cir. 2006) (quoting *PDK Laboratories, Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) (other citations omitted)). In the matter before us, the OPM has expressed its conclusion that Congress spoke clearly to the matter at issue and therefore exercised no resolution of ambiguity. *Chevron* step two deference is thus inappropriate.

Specifically, the OPM stated: "While we understand the agency's concerns about administrative burdens, the law expressly provides that the annual premium pay cap must be applied to an entire calendar year and that it is based on the applicable rates in effect at the end of the calendar year." *Premium Pay Limitations*, 69 Fed. Reg. 55941, 55941 (Sept. 17, 2004). More explicitly, the OPM stated: "Agencies cannot

avoid certain administrative burdens based on the express statutory language in 5 U.S.C. 5547(b)(2), and we cannot change the regulations without a legislative amendment to reduce or eliminate these administrative burdens." *Id.* It appears to me that under *Peter Pan Bus Lines* and the cases collected therein, we must either rule up or down on the agency's interpretation and not affirm on the basis of deference to its exercise of discretion it deemed itself not to have.

Nonetheless, I concur fully in the result, as it appears to me that the agency followed the plain meaning of the statute as required by *Chevron* step one. *Chevron*, 467 U.S. at 842-43.

As the majority rightly observes, courts have at times assumed without deciding the applicability of the *Chevron* framework. Maj. Op. at 13; *see, e.g.*, *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1054 n.8 (9th Cir. 2010). Nonetheless, I am not convinced that the majority's reasoning today is consistent with our own precedent in the *Peter Pan Bus Lines* line of cases. In this case, however, because I believe the OPM interpretation is consistent with the plain language of the statute at *Chevron* step one, I concur in the judgment affirming the district court's grant of summary judgment to the defendants.